131 Cal.Rptr.2d 100 (2003)
106 Cal.App.4th 349
COUNTY OF SAN DIEGO, Cross-Complainant and Appellant,
v.
ACE PROPERTY & CASUALTY INSURANCE COMPANY et al., Cross-Defendants and Respondents.
No. D038707.
Court of Appeal, Fourth District, Division One.
February 19, 2003.
Review Granted April 23, 2003.
*101 John J. Sansone, County Counsel, William L. Pettingill, Deputy County Counsel; Massie, Berman & Millerick, Michael F. Millerick, San Diego; Latham & Watkins, David L. Mulliken and Christine Gregorski *102 Rolph, San Diego, for Cross-complainant and Appellant.
Anderson Kill & Olick, Alex D. Hardiman, William G. Passannante; Law Offices of Amy Bach, Amy Bach, San Francisco, for United Policyholders; Zevnik Horton and David S. Cox, Los Angeles, as Amici Curiae for Cross-complainant and Appellant.
Crowell & Moring, Jonathan H. Pittman, Mark D. Plevin; Chapin Shea McNitt & Carter, Edward D. Chapin, San Diego, Maria C. Roberts and Shirley A. Gauvin, San Diego, for Cross-defendants and Respondents.
McCONNELL, J.
In this insurance coverage action, cross-complainant County of San Diego (the County) appeals a judgment entered against it after the trial court granted the summary adjudication and summary judgment motions of cross-defendant Ace Property & Casualty Insurance Company (ACE).[1] The County contends the trial court misinterpreted ACE's nonstandard third party liability policy as not providing coverage for the County's settlements of nonlitigated claims, including an administrative order to remediate groundwater contamination and third party property damage claims arising from the contamination. Specifically, the County asserts (1) the court erred by applying Certain Underwriters at Lloyd's of London v. Superior Court (2001) 24 Cal.4th 945, 103 Cal. Rptr.2d 672, 16 P.3d 94 (Powerine I), in which our Supreme Court held the term damages in the insuring clause of a standard comprehensive general liability (CGL) policy is limited to sums ordered by a court, and alternatively, (2) the County raised triable issues of fact regarding whether ACE's reservation of rights to deny coverage or other allegedly wrongful conduct allowed the County to protect its interests by settling the claims without ACE's consent and then obtain reimbursement for the settlements. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
ACE issued a nonstandard third party liability policy to the County that was effective between 1974 and 1977.[2] The policy requires ACE to indemnify the County "for all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement," arising from "damages" caused by personal injuries or the destruction or loss of use of tangible property.
In 1969 the County began operating a solid waste facility known as the Ramona Landfill. The Ramona Landfill overlies potable groundwater, and in 1970 the Regional Water Quality Control Board (the Board) imposed operational requirements on the County.
In March 1997 the Board issued a cleanup and abatement order (CAO 97-17) to the County, which required it to investigate, monitor and remediate groundwater contamination caused by the Ramona Landfill. The County waived a hearing *103 before the Board to challenge imposition of CAO 97-17.
In June 1997 the owners of property (the Sossamans) near the Ramona Landfill complained to the County that groundwater contamination would affect the property's marketability and their physical and mental health. The Sossamans requested that the County purchase their property without the necessity of litigation. The County believed it more likely than not that the Sossamans' property was contaminated. It had the property appraised "and preliminary negotiations including the preparation of necessary transfer documentation was initiated." The Atkinsons, also property owners near the Ramona Landfill, filed a similar claim in 1997.
In November 1997 the County settled the Sossamans' claims by paying them $318,000 for the acquisition of their property and relocation benefits. In December 1998 the County settled the Atkinsons' claims by paying them $259,500 for the acquisition of their property and relocation benefits.
In May 1997 the County began seeking indemnification from ACE for costs of complying with CAO 97-17. ACE reserved its right to deny coverage on numerous grounds, including the absence of a third party lawsuit. In September 1997 the County began seeking indemnification from ACE for the Sossaman and Atkinson claims. Regarding these claims, none of the correspondence between the County and ACE is included in the appellate record. In any event, ACE never indemnified the County for any of the settlements.
The County then filed a cross-complaint against ACE in a declaratory relief action brought against the County by another of its insurers, Pacific Indemnity Company (Pacific).[3] The County's first amended cross-complaint included causes of action for declaratory relief, express indemnity, breach of contract and breach of the implied covenant of good faith and fair dealing. In the breach of contract cause of action, the County alleged ACE breached its duty to indemnify the County for losses it incurred in complying with CAO 97-17 and in settling the Sossaman and Atkinson claims. In its cause of action for breach of the implied covenant of good faith and fair dealing, the County alleged, among other things, that Ace failed to "attempt [ ] in good faith to effectuate a prompt, fair and equitable settlement of the County's claims for indemnification although liability had become reasonably clear" and failed "to pay indemnification benefits to the County pursuant to said claims."
In an affirmative defense to the cross-complaint, ACE alleged it had no duty to indemnify the County for sums incurred in complying with CAO 97-17 and in settling the Sossaman and Atkinson claims, because the term damages in the coverage clause of the policy is limited to sums imposed by a court of law. The County moved for summary adjudication on this affirmative defense. The court granted the motion, determining the "language of the policy suggests a reasonable interpretation that the County need not suffer a judgment before [ACE's] duty to indemnify takes effect."
ACE moved for reconsideration of the ruling on the County's motion for summary adjudication, based on Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, in which the court held the term damages in the insuring clause of a standard CGL policy is restricted to sums imposed by a court of law. On the same ground, ACE also moved for summary adjudication of its duty to indemnify the *104 County for its expenses of complying with CAO 97-17.
On reconsideration, the trial court denied the County's motion for summary adjudication. The court granted ACE's motion for summary adjudication of its duty to indemnify the County for cleanup expenses. The court determined that despite the nonstandard nature of the ACE policy, under Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, ACE's duty of indemnity was limited to sums imposed by a court of law.
The County then moved for reconsideration of the court's order granting ACE's motion for summary adjudication. ACE moved for summary judgment regarding its duty to reimburse the County for the Sossaman and Atkinson settlements. The court reconsidered its ruling in favor of ACE, but on the merits denied the County any relief. The court granted ACE's motion, explaining "[t]here is no duty to indemnify [the] County for the so-called `private property expenses' (purchase and moving expenses) because they were not `money ordered by a court.'" Judgment was entered for ACE on July 20, 2001.

DISCUSSION

I

Standard of Review
"The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy." (Smith Kandal Real Estate v. Continental Casualty Co. (1998) 67 Cal. App.4th 406, 414, 79 Cal.Rptr.2d 52.)

II

Rules of Policy Interpretation
"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.]" (Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545.) "The rules governing policy interpretation require us to look first to the language of the contract . . . to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. [Citations.]" (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the `mutual intention' of the parties. . . . `Such an intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citations], controls judicial interpretation. [Citation.]' [Citations.]" (Ibid.)
"Ambiguity exists when an insurance policy provision is susceptible to two or more constructions that are reasonable and not based on strained interpretations." (Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal.App.4th 715, 737, 15 Cal. Rptr.2d 815.) Standing alone, the absence of a definition in the policy for a term does not render it ambiguous. (Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 866, 21 Cal. Rptr.2d 691, 855 P.2d 1263.) "`[Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *105 cannot be found to be ambiguous in the abstract.'" (Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal. Rptr.2d 538, 833 P.2d 545, italics omitted.) If "a term in an insurance policy has been judicially construed, it is not ambiguous and the judicial construction of the term should be read into the policy unless the parties express a contrary intent." (Bartlome v. State Farm Fire & Casualty Co. (1989) 208 Cal.App.3d 1235, 1239, 256 Cal. Rptr. 719.)

III

Applicability of Powerine I's Definition of Damages

A
Under ACE's policy, its indemnification duty extends to "all sums which [the County] is obligated to pay by reason of liability imposed by law or assumed under contract or agreement" for "damages . . . by reason of injury of any nature sustained by any person or persons" or for "damages because of injury to or destruction of tangible property." (Italics added.) The County contends the trial court erred by determining that under Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, the term damages in the insuring clause of the ACE policy is limited to sums ordered by a court of law.
In Powerine I, the standard CGL policy covered "`all sums that the insured becomes legally obligated to pay as damages'" for harm proved within coverage. (Powerine I, supra, 24 Cal.4th at p. 950, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added.) The court held the term damages is limited to "money ordered by a court." (Id. at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94.) Thus, although environmental cleanup costs may be property damages covered by the policy (AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 837, 274 Cal.Rptr. 820, 799 P.2d 1253 (AIU)),[4] the indemnity duty does not "extend to any [cleanup] expenses required by an administrative agency, like the Regional Water Boards, pursuant to an environmental statute, like the Porter-Cologne Act," absent a court order requiring the insured to pay such expenses. (Powerine I, at p. 974, 103 Cal.Rptr.2d 672,16 P.3d 94.)
In Powerine I, the court focused on the correlation between the standard policy's duty of indemnification and duty to defend suits brought against the insured. The court reasoned that because the term suits is limited to civil court actions (Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 878-888, 77 Cal. Rptr.2d 107, 959 P.2d 265 (Foster-Gardner)), and the duty to defend is broader than the duty to indemnify, the duty to indemnify is limited to sums ordered by a court in a suit. (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal.Rptr.2d 672, 16 P.3d 94 [referred to by the court as the Foster-Gardner syllogism].) The court explained, "the provision imposing the duty to indemnify, which can arise only after damages are fixed in their amount, generally states that the insurer `will pay all sums that the insured becomes legally obligated to pay as damages' for harm proved within coverage. [¶] The provision imposing the duty to defend expressly links `damages' to a `suit,' i.e., a civil action prosecuted in a court. For it is in a `suit' that `damages' are sought in some amount through the court's order. [¶] The provision *106 imposing the duty to indemnify impliedly links `damages' to a `suit,' i.e., a civil action prosecuted in a court. For it is in a `suit' that `damages' are fixed in their amount through the court's order." (Id. at pp. 961-962, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
The insuring clauses of the standard CGL policy discussed in Powerine I and the ACE policy are substantively the same. The County contends the definition of damages in Powerine I is nonetheless inapplicable because of differences in other provisions of the policies. The County contends that because the ACE policy contains no duty to defend suits, the term damages in the coverage clause is not linked to a civil action and the Foster-Gardner syllogism is inapplicable.
However, in Powerine I the court did not rely on the Foster-Gardner syllogism alone in interpreting the term damages. Rather, the court also concluded: "The wider focus on the standard policy within the legal and broader culture[5] also reveals that the duty to indemnify is limited to money ordered by a court. [¶] The duty to indemnify runs to `all sums that the insured becomes legally obligated to pay as damages.' [¶] `Damages' exist traditionally inside of court. [Citations.] [¶] For its part, `harm' exists traditionally outside of court. [Citations.] [¶] `Damages' and `harm' are related the one to the other: `Harm' outside of court may result in `damages' inside of court, and `damages' inside of court result from `harm' outside of court. [Citations.] [¶] Again, the duty to indemnify runs to `all sums that the insured becomes legally obligated to pay as damages.'
"To be sure, one might speak of a `sum that the insured becomes legally obligated to pay' simpliciter  omitting `as damages'  apart from any order by a court. For one might say that the insured is legally obligated to pay some such sum under abstract legal rules alone. Thus, one might say that a driver of an automobile is legally obligated to comply with all laws relating to use of the roads apart from any order by a court. One might also say that the driver is legally obligated to pay the toll required by such laws for passage over a designated bridge apart from any such order.
"But one would not speak of any `sum that the insured becomes legally obligated to pay as damages' apart from any order by a court. For one would not say that the insured is legally obligated to pay some such sum as damages under abstract rules alone. That is because, as a sum that the insured becomes legally obligated to pay, `damages' presuppose an institution for their ordering, traditionally a court, albeit no longer exclusively. [Citations.] `Damages' do not constitute a redundancy to a `sum that the insured becomes legally obligated to pay,' but a limitation thereof." (Powerine I, supra, 24 Cal.4th at pp. 962-963, 103 Cal.Rptr.2d 672, 16 P.3d 94, fn. omitted.)
Given this language, the absence in the ACE policy of a duty to defend suits does not show the inapplicability of Powerine I's definition of damages. We also reject *107 the County's assertion that Powerine I is inapplicable because in describing the limits of liability, the ACE policy refers to claims as well as suits:
"LIMITS OF LIABILITY: Liability under this policy shall attach to the company only after . . . the named insured [has] paid or [has] been liable to pay, the full amount of [its] respective ultimate net loss liabilities as follows:
"100,000 EACH OCCURRENCE
"250,000 ANNUAL AGGREGATE
"Personal Injury or Property Damage or Personal Injury and Property Damage combined
"and the company shall then be liable to pay only such additional amounts as will provide the insured with a total coverage under the policy . . . and/or whatever portion of coverage is self-insured by the named insured, and this policy combined of:
"$1,000,000.00 each occurrence combined single limit for Personal Injury or Property Damage. . . .
"It is hereby agreed that should the named insured utilize a self-insurance program or a self-insured retention arrangement for any part of the underlying limits of liability, then the named insured's salaried employees or their designee shall be used as adjusters on behalf of the named insured. It is further agreed that all legal matters concerning claims under this policy is excess of any self-insured portion of underlying coverage shall be coordinated through a firm or person mutually agreed upon." (Italics added.)
The policy defines "`ultimate net loss,'" as used in the above provision, as "the sum or sums which the assured shall become legally obligated to pay in settlement or satisfaction of claims, suits or judgements . . . includ[ing] all expenses from the investigation, negotiation and settlement of claims . . . and shall include legal costs." (Italics added.)
In the recent case of Powerine Oil Co. v. Superior Court (2002) 104 Cal.App.4th 957, 128 Cal.Rptr.2d 827 (Powerine II), the court held that Powerine I's definition of damages was inapplicable to excess/umbrella policies that provided coverage "`for all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by law . . . for damages, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" on account of: . . . property damage . . . caused by or arising out of each occurrence. . . .'" (Powerine II, at p. 963, 128 Cal.Rptr.2d 827; some italics omitted.) The policies there defined "`ultimate net loss'" as "`the total sum which the Insured . . . become[s] obligated to pay by reason of . . . property damage . . . either through adjudication or compromise . . . and for litigation, settlement, adjustment and investigation of claims and suits which, are paid as a consequence of any occurrence covered hereunder. . . .'" (Ibid., italics omitted.)
In contrast to Powerine II, the ACE policy's insuring clause does not include the term "expenses" to broaden the coverage beyond that provided by the word "damages." (See Powerine II, supra, 104 Cal.App.4th at p. 969, 128 Cal. Rptr.2d 827.) Further, the insuring clause does not define the term "damages" by reference to the "ultimate net loss" provisions, in which the references to the settlement or satisfaction of claims appears. (See ibid.) "The `insuring clause' is the basic agreement by the insurance company to provide coverage to its insured. . . . [¶] An insuring clause is the foundation of the agreement and forms the basis for all obligations owed to the insured." (Croskey et *108 al., Cal. Practice Guide: Insurance Litigation, supra, § 3:71, p. 3-15.) Although a "claim" is not a "suit," or civil court action (Foster-Gardner, supra, 18 Cal.4th at pp. 878-879, 880, 77 Cal.Rptr.2d 107, 959 P.2d 265), the insuring clause of the ACE policy incorporates no language indicating the indemnity duty extends to the settlement or satisfaction of nonlitigated claims to which ACE does not consent. In Powerine I, the court concluded that an other insurance/excess insurance provision in the standard CGL policy that referred to a "`covered' `loss or claim,'" "does not state or imply that the insurer owes a duty to fund a settlement that is not reduced to contract to which it agrees." (Powerine I, supra, 24 Cal.4th at p. 962, fn. 4, 103 Cal.Rptr.2d 672, 16 P.3d 94, first italics added.)
Further, in Powerine II the policies did not contain a "no action" provision. (Powerine II, supra, 104 Cal.App.4th at p. 976, 128 Cal.Rptr.2d 827.) In Powerine I, the court noted that the standard policy's "no action" provision supports its conclusion the term damages is limited to sums ordered by a court. Such a provision "generally states that `no action' by a third party `shall lie' against the insurer unless the insured's `obligation to pay shall have finally been determined' either by a `judgment' against the insured `obtained after an actual trial' or by a `settlement' reduced to contract to which the insurer `agrees.'" (Powerine I, supra, 2A Cal.4th at p. 962, fn. 4, 103 Cal.Rptr.2d 672, 16 P.3d 94.) The court explained: "This provision implies that the insurer may owe a duty to fund such a settlement [one agreed to by the insurer]. It also implies that the insurer may owe a duty to indemnify. In so doing, referring as it does to a `judgment,' it implies as well that that duty is limited to money ordered by a court." (Ibid.)
Similarly, the ACE policy provides that "[n]o action shall lie against the company unless, as a condition precedent thereto, . . . the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company." The ACE policy also provides that the County "shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence." Conditions such as these ordinarily appear in policies including the duty to defend, and they are intended to invest the insurer with the right to control the defense and preclude collusion between the insured and the third party claimant. (Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 7:439.6, p. 7A-116.) These conditions belie the notion that the term damages in the ACE policy extends the indemnity duty to any settlement entered into by the County.[6]
We are bound by Supreme Court precedent. Given that the court's holding in Powerine I, supra, 2A Cal.4th 945, 103 *109 Cal.Rptr.2d 672, 16 P.3d 94, was not predicated solely on the Foster-Gardner syllogism, but also on the "wider focus on the standard policy within the legal and broader culture" (id. at p. 962, 103 Cal.Rptr.2d 672, 16 P.3d 94), and that the ACE policy read as a whole demonstrates the applicability of Powerine I's definition of damages, we conclude it controls here. Accordingly, judgment for ACE was proper.[7]

B
In arguing against this result, the County relies on AIU, supra, 51 Cal.3d at p. 814, 274 Cal.Rptr. 820, 799 P.2d 1253, in which the court held the plain meaning of the term damages in standard CGL policies includes "the costs of reimbursing government agencies and complying with injunctions ordering cleanup under [Comprehensive Environmental Response, Compensation, and Liability Act] and similar statutes." In AIU, however, the United States and local administrative agencies had sued the insured for reimbursement of cleanup costs, and the insured brought a declaratory relief action against the insurers to establish the policies covered any costs that may be ordered in the underlying actions.
In Powerine I, supra, 24 Cal.4th at p. 966, 103 Cal.Rptr.2d 672, 16 P.3d 94, the court explained that in AIU "we held to the effect that the duty to indemnify may embrace all money ordered by a court, including `money that the insured must give under law as compensation to third parties' and also `money that the insured must itself expend in equity in order to provide relief of the same sort.' [Citation.] We did not hold that the duty extends to any money in addition to that ordered by a court  including any expenses required by an administrative agency pursuant to an environmental statute."
The County's reliance on Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229 (Vandenberg), is also misplaced. In Powerine I, the court explained: "[In Vandenberg] . . . we held to the effect that the duty to indemnify may embrace all money ordered by a court, including money ordered by a court under the law of torts and, in some cases, money ordered by a court under the law of contracts. [Citation.] Again, we did not hold that the duty extends to any money in addition to that ordered by a court  including any expenses required by an administrative agency pursuant to an environmental statute. Indeed, we implied the opposite, albeit only in dictum, stating to the effect that the duty depends on a legal obligation to pay a sum as damages, which depends in turn on `liability imposed in a definite sum by a final judgment. . . .'" (Powerine I, supra, 24 Cal.4th at p. 966, 103 Cal.Rptr.2d 672, 16 P.3d 94, citing Vandenberg, supra, 21 Cal.4th at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.)
Also lacking merit is the County's assertion the ACE policy covers cleanup costs and other nonlitigated settlements because such coverage is not specifically excluded. "Insurance policies are written in two parts: an insuring agreement which defines the type of risks being covered, and exclusions, which remove coverage for certain risks which are initially within the insuring clause. . . . [¶] . . . [W]hen an occurrence is clearly not within the coverage clause, it does not also have to be specifically *110 excluded." (Rosen v. Nations Title Ins. Co. (1997) 56 Cal.App.4th 1489, 1497, 66 Cal.Rptr.2d 714.)
Moreover, contrary to the County's contention, there is no coverage under the ACE policy because the environmental cleanup costs and Sossaman and Atkinson settlements were liabilities assumed under a contract. The coverage clause requires ACE to indemnify the County for "all sums which [it] is obligated to pay by reason of liability imposed by law or assumed under contract or agreement," for damages attributable to injury to person or property. However, "the insured must assume the other contracting party's tort liability to third parties in order for insured contract coverage to attach." (Richmond & Black, Expanding Liability Coverage: Insured Contracts and Additional Insureds (1996) 44 Drake L.Rev. 781, 784; Bernstein v. Consolidated American Ins. Co. (1995) 37 Cal.App.4th 763, 771, 43 Cal. Rptr.2d 817, disapproved on another ground in Vandenberg, supra, 21 Cal.4th at p. 841, fn. 13, 88 Cal.Rptr.2d 366, 982 P.2d 229; Croskey et al, Cal. Practice Guide: Insurance Litigation, supra, H 7:149.6, p. 7A-49.) Here, the County did not assume the tort liability of another.

IV

ACE's Conduct

A
Alternatively, the County contends that notwithstanding the applicability of Powerine I's definition of damages, the disposal of its cross-complaint on summary adjudication and summary judgment was improper. The County asserts it raised triable issues of fact as to whether ACE's alleged misconduct  the untimely response to tenders of third party claims and the reservation of rights to deny coverage  allowed the County to protect its interests by settling the claims without ACE's consent and then obtain reimbursement from ACE.
The County relies on Isaacson v. California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297 (Isaacson), and Lamb v. Belt Casualty Co. (1935) 3 Cal.App.2d 624, 40 P.2d 311 (Lamb). In Isaacson, the court stated: "[I]f an insurer `erroneously denies coverage and/or improperly refuses to defend the insured' in violation of its contractual duties, `the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement. . . .' [Citation.]" (Isaacson, at p. 791, 244 Cal.Rptr. 655, 750 P.2d 297, quoting Clark v. Bellefonte Ins. Co. (1980) 113 Cal.App.3d 326, 335, 169 Cal. Rptr. 832.) In Lamb, at pp. 630-631, 40 P.2d 311, the court held the insurer's denial of liability and refusal to defend was a breach of contract and released the insured from its obligation to leave the defense of the action to the insurer.[8]
*111 ACE counters that its conduct is immaterial because under Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, the indemnity duty does not arise until a court of law has ordered the insured to pay for injury to person or property. Accordingly, absent a court order establishing the indemnity duty there can be no breach of contract or breach of the implied covenant of good faith and fair dealing.
"[T]here are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause. [Citations.]" (Love v. Fire Ins. Exchange (1990) 221 Cal.App.3d 1136, 1151, 271 Cal.Rptr. 246, italics added.) "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement. [Citation.] . . . Absent that contractual right, . . . the implied covenant has nothing upon which to act as a supplement, and `should not be endowed with an existence independent of its contractual underpinnings.' [Citation.]" (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 36, 44 Cal.Rptr.2d 370, 900 P.2d 619.) If no benefits are due under the policy, there can be no bad faith denial of coverage. (Ibid.)
In our view, we are constrained under Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, to reject the County's position. When Powerine I's definition of damages applies, as here, there are two components of indemnity coverage  injury to person or property as defined by the policy and a court order requiring the insured to pay damages for such injuries. It is undisputed that the latter element is missing here. Accordingly, no indemnity was due under the contract, and by denying coverage, or actually reserving its right to deny coverage, ACE breached neither the contract nor the implied covenant of good faith and fair dealing. Under the County's theory, the second component of indemnity coverage  a court order  is impermissibly ignored, and the insurer's duties of good faith are measured solely by reference to the first component  injury to person or property.
In Powerine I, the insured relied on Isaacson, supra, 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297, and Lamb, supra, 3 Cal.App.2d 624, 40 P.2d 311. The court concluded that neither case "supports a reading of the provision without any limitation to money ordered by a court. Rather, each stands, at most, for the proposition that, when an insurer breaches one of its duties, the insured may recover damages for harm arising therefrom, including an amount that it paid a third party in settlement. [Citations.]" (Powerine I, supra, 24 Cal.4th at p. 970, 103 Cal.Rptr.2d 672, 16 P.3d 94.) For an indemnity duty to arise there must be coverage, which under Powerine I includes not only injury to person or property as defined by the policy, but also a money judgment or order rendered in a lawsuit.
We understand this result has harsh consequences for insureds, because by settling claims without the necessity of litigation, they ensure noncoverage. However, in Powerine I, the court rejected the notion that public policy precluded such a result. The court explained: "[N]ot even for considerations of public policy would we rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court. In any event, such considerations seem hardly substantial. In spite of the limitation  *112 from all that appears both generally and specifically with regard to proceedings conducted before administrative agencies pursuant to environmental statutes  compromise is regularly achieved, and litigation is regularly avoided. . . . We may infer that, in a `large percentage' of [potentially covered] disputes, insurers exercise their right [to settle]. [Citations.] That is because we know that, in a `large percentage' of such disputes, they in fact achieve compromise and avoid litigation. [Citations.]" (Powerine I, supra, 24 Cal.4th at p. 971, 103 Cal.Rptr.2d 672,16 P.3d 94.)
Further, in Powerine I, the court set a specific standard by which an insurer's indemnity obligations can be measured. The court concluded that "[i]n its limitation to money ordered by a court, the provision imposing the duty to indemnify commends itself to society generally as laying down a bright-line rule. It has a tendency to promote fairness and efficiency in the judicial sphere. By increasing certainty and decreasing uncertainty about the duty to indemnify, it serves to deter some litigation on the issue and to conclude what it does not deter expeditiously and soundly." (Powerine I, supra, 24 Cal.4th at pp. 965-966, 103 Cal.Rptr.2d 672, 16 P.3d 94.) The imposition of express or implied duties of the insurer based solely on claims, notwithstanding the lack of a court order, would erode the bright-line rule.[9]

B
Relying on Diamond Heights, supra, 227 Cal.App.3d 563, 277 Cal.Rptr. 906, the County suggests this case is distinguishable from Powerine I because ACE is an excess insurer, and as such, it had a duty to settle the nonlitigated third party claims. When the policy provides for a self-insured retention, as here, under certain circumstances the insured is considered the primary insurer and the carrier on the risk for sums greater than the retention is considered the excess insurer. (Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, at §§ 7:384, 7:387, 7:387.11, pp. 7A-102 to 7A-105.) In Diamond Heights, the court explained that "[a]ny insurer, whether excess or primary, in conducting settlement negotiations, is subject to an implied duty of good faith and fair dealing which requires it to consider the interests of the insured equally with its own and evaluate settlement proposals as though it alone carried the entire risk of loss. [Citations.]" (Diamond Heights, supra, at p. 578, 277 Cal. Rptr. 906.)
However, it appears the Diamond Heights court did not impose a duty on an excess insurer to conduct settlement negotiations, but rather explained when it voluntarily undertakes such negotiations it must act in good faith. For instance, the court noted that the primary insurer "controls] . . . all aspects of the defense, including the negotiation of any settlement prior to trial. [Citations.] The excess insurer has no right to step in and try to settle the case [citation], unless perhaps it has exercised its option . . . to associate with the primary insurer in the defense." (Diamond Heights, supra, 227 Cal.App.3d at p. 578, 277 Cal.Rptr. 906; see also Continental Casualty Co. v. Royal Ins. Co. (1990) 219 Cal.App.3d 111, 119, 268 Cal. Rptr. 193 ["excess carrier has no duty to investigate settlement options"].) Notably, in its opening brief the County concedes that "ACE had the option of declining involvement in the adjusting process."
In any event, we are not required to resolve the issue because the appellate *113 record reveals no triable issue of material fact regarding any opportunity of ACE to explore settlement options. At the trial court the County submitted numerous letters it exchanged with ACE, but they are not included in the appellate record. At oral argument, ACE submitted three of the letters: The County's May 7, 1997, and July 16, 1997, letters demanding indemnity for expenses incurred in complying with CAO 97-17, and ACE's July 17, 1997, letter reserving rights to deny coverage on numerous grounds, including the lack of a third party lawsuit. These letters were exchanged after the County waived its right to challenge the imposition of CAO 97-17, and thus as a matter of law ACE could not have breached any arguable settlement duty regarding that claim. Moreover, the letters do not even mention the Sossaman or Atkinson claims.[10]
"The appellant must affirmatively show error by an adequate record." (9 Witkin, Cal. Procedure (4th ed.1997) Appeal, § 518, p. 562.) Further, "it is not proper practice on appeal to refer in briefs to circumstances not established by the record. [Citations.]" (Davis v. Thayer (1980) 113 Cal.App.3d 892, 912, 170 Cal. Rptr. 328; Lady v. Barrett (1941) 43 Cal. App.2d 685, 688, 111 P.2d 702; Randall v. Allen (1919) 180 Cal. 298, 302, 180 P. 941; Arruda v. Arruda (1963) 218 Cal.App.2d 410, 414, 32 Cal.Rptr. 257.)

DISPOSITION
The judgment is affirmed. ACE is awarded its costs on appeal.
WE CONCUR: McDONALD, Acting P.J., and O'ROURKE, J.
NOTES
[1] The named cross-defendants also included ACE's predecessor companies, Cigna Property & Casualty Company and Aetna Insurance Company.
[2] "Insurance policies are usually issued on standard forms containing terms and conditions drafted by the insurance company." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) § 3:33, p. 3-6.) However, "[i]n certain cases, the terms and conditions of the policy are arrived at through negotiations between the insurer and insured. These policies are often referred to as `manuscript' (nonstandard) forms." (Id. at § 3:38, p. 3-7.)
[3] Pacific obtained summary judgment in its favor and is not involved in this appeal.
[4] In Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 56, 70 Cal. Rptr.2d 118, 948 P.2d 909, the court held the indemnity duty "is not narrowly confined to money that the insured must give under law as compensation to third parties, but may also include money that the insured must itself expend in equity in order to provide relief of the same sort."
[5] The court relied on the following comments of Justice Mosk in his concurring opinion in Kopp v. Fair Pol. Practices Com. (1995) 11 Cal.4th 607, 47 Cal.Rptr.2d 108, 905 P.2d 1248: "To seek the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to discern the sense of the statute, and therefore its words, in the legal and broader culture. Obviously, a statute has no meaning apart from its words. Similarly, its words have no meaning apart from the world in which they are spoken. [Citation.]" (Id. at p. 673, 47 Cal.Rptr.2d 108, 905 P.2d 1248, cone. opn. of Mosk, J.)
[6] The County asserts that given the references to claims and settlement of claims in the ACE policy, it reasonably expected coverage for its unilateral settlement of nonlitigated claims. To any extent an insured's objectively reasonable expectations may be considered in interpreting an insurance contract when no issue of ambiguity is raised (see Bank of the West v. Superior Court, supra, 2 Cal.4th at pp. 1264-1265, 10 Cal.Rptr.2d 538, 833 P.2d 545; Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at pp. 27-28, 44 Cal.Rptr.2d 370, 900 P.2d 619; Nissel v. Certain Underwriters at Lloyd's of London (1998) 62 Cal.App.4th 1103, 1112, 73 Cal.Rptr.2d 174), we reject the County's position, particularly in light of the "no action" and "no voluntary payment" conditions. (See Xebec Development Partners, Ltd. v. National Union Fire Ins. Co. (1993) 12 Cal.App.4th 501, 531, 15 Cal.Rptr.2d 726.)
[7] We accepted the amicus curiae brief of United Policyholders, "a not-for-profit educational organization . . . dedicated to educating policyholders about their rights and duties under their insurance policies." The principal complaint of United Policyholders, however, is that Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, was wrongly decided.
[8] See also National American Ins. Co. of California v. Certain Underwriters at Lloyd's London (1996) 93 F.3d 529, 540 [insurers that ignored insured's communications were estopped from defending on the theory they gave no consent to litigation costs]; Diamond Heights Homeowners Assn. v. National American Ins. Co. (1991) 227 Cal.App.3d 563, 579-580, 277 Cal.Rptr. 906 [triable issues existed as to whether excess insurer was given the opportunity to voluntarily assume defense to avoid settlement, and if it waived the opportunity, it may be liable to primary insurer for share of settlement of litigated claim] (Diamond Heights); and Walters v. American Ins. Co. (1960) 185 Cal.App.2d 776, 785, 8 Cal. Rptr. 665, citing Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654, 328 P.2d 198 [insured who settled nonlitigated personal injury claim was entitled to reimbursement for the settlement because insurer wrongfully denied coverage on the theory the insured intentionally harmed the party].)
[9] We express no opinion on whether, after Powerine I, supra, 24 Cal.4th 945, 103 Cal. Rptr.2d 672, 16 P.3d 94, an insurer's conduct may expose it to liability for the insured's settlement of a third party lawsuit, as opposed to a nonlitigated claim.
[10] We denied the County's request after oral argument to augment the record with "various correspondence between [ACE] and the County relating to these [third party] claims."